## STATE OF LOUISIANA *v.* LOUISIANA SAVINGS COMPANY.

The Act of the Legislature incorporating the Louisiana Savings Company, was not intended to create a banking institution; it conferred no power to issue notes for circulation, and the laws relative to banking corporations are not applicable to such an institution.

The business of a Savings Company is of such a character that temporary suspension of payment which is almost necessarily connected with its organization, and must have been contemplated by the Legislature, cannot be regarded as an absolute cause of forfeiture. A fraudulent suspension of payment or gross negligence in loaning money without sufficient guaranty by which temporary suspension of payment might ensue, would be different.

From the peculiar nature of the charter of the company, it was *held:* That the closing of the doors, the cessation of business and the temporary suspension of the company for a few days, were not sufficient causes for forfeiture.

APPEAL from the Third District Court of New Orleans, *Kennedy*, J.

*E. W. Moïse*, Attorney General, for the State. *L. Hunton*, for defendant and appellant.

COLE, J. (SPOFFORD, J., and VOORHIES, J., dissenting.) On the 3d March, 1856, the Commissioners (or Trustees) of the Louisiana Savings Company, notified the public, they deemed it their duty to place in liquidation the affairs of the institution; that its liabilities did not exceed $50,000, and the assets would realize about $45,000, although they were nominally more. They were induced to do this by a sudden panic, caused by the rumor that the President of the company, *William H. Garland*, would probably be arrested for alleged defalcation as Treasurer of the city of New Orleans, and also by a mistake in relation to the accounts of *Garland* with the company, he being really their creditor instead of their debtor.

Contemporaneous with this rumor, a large amount of deposits were withdrawn without notice, although a part so taken was upon interest, and previ-

ous notice might have been required. An open credit with the Bank of Orleans was also suddenly withdrawn without notice.

On the 8th of March, 1856, the public was informed that the institution was then fully prepared to resume business and meet all its engagements, whether for its deposits on time or on call, and that the office would open on Monday, 10th inst.

This institution was thus closed from the 3d to the 10th of March, a period of seven days, and for that time ceased receiving or paying deposits.

On the 15th of April, 1856, this proceeding was instituted by the Attorney General, for the forfeiture of the charter granted by the General Assembly of the State, by an Act approved March 16th, 1854. Session Acts of 1854, page 163.

The reasons for which the privileges conferred by the charter are alleged to be forfeited are, that by said notice of March 3d, the Directors deliberately and wilfully closed the doors of the institution, refused to receive or pay deposits, announced its insolvency, and its purpose to go into liquidation; that the "scope and object" of the incorporation were defeated by the said conduct of the company in closing its doors and giving the notice that the end for which the franchises had been granted was perverted, and its corporate franchises had become forfeited by misuses and abuse.

There was judgment in the lower court, decreeing the forfeiture of the charter.

Before entering upon the argument to show that this judgment is erroneous, we will make some general remarks in answer to some of the reasons which have been urged in its favor.

It is averred, that the misuse and abuse of corporate functions, when they are such as are contemplated by Article 438 of the Civil Code, are sufficient grounds upon which to declare the forfeiture of an Act of incorporation.

This is not denied, but such misuse and abuse must be of that grave character which is intended by that Article.

No wise jurist and no good citizen can pretend that a slight misuse or abuse of corporate functions, is a valid cause of forfeiture; if such a doctrine should obtain, then suits might be instituted against our banks for the most minute variation from rigid canons of correct administration.

Imperfections appertain to humanity, and it is not to be presumed that the lawgiver expected that corporations would be exempt from the general rule; as they are managed by human beings, it is to be supposed that some acts of the Directors may be liable to slight animadversion; but if the dogma of perfection is to prevail, then there would constantly be proceedings instituted for the forfeitures of charters of banks, which would produce depreciation of stock, loss by holders of their bills, a stringency in the money market, and a general financial derangement.

It is also asserted that it is a tacit condition of every Act of incorporation, that its scope and designs shall be carried out. We admit this to be correct, but the admission is not to be supposed to convey the doctrine that the scope and design of incorporation must always be perfectly accomplished, otherwise, that forfeiture shall follow. This would again be the adoption of the canon of perfection, which would create the disastrous results just portrayed.

It is suggested that the object of this Savings Institution, is *alone* to benefit the more humble classes of society, and not its administrators. This corpora-

tion received its charter from the Legislature, and the object of the grant was to advance the interests of the laboring classes; but did ever any legislator imagine that all those who applied to be incorporated, in order to carry out some great work of public amelioration or to benefit a part of the public, were pure philanthropists and expected no personal benefit!

In this age, almost all important operations are conducted by corporations. The Savings Institute, like many other corporate bodies, is intended to benefit the laboring classes, and also those who conduct it; it is not an eleemosynary corporation; persons may deposit their funds, but the principal advantage of depositing is to receive an interest on the deposits, and the trustees have the right to expect to be recompensed for their trouble in superintending its affairs in the event their operations are successful.

It is alleged, that the charter of this company ought to be forfeited, if, after an important ordeal, it should appear that any part of the entire capital deposited had been lost, or if depositors were not always paid, at the times stipulated, the principal and interest of their deposits; this doctrine is also without any sound legal basis, so far as this institution is concerned, for we shall demonstrate hereafter, that the very nature of this charter raises the presumption, that this company may not always be able to meet its obligations, and without being subjected to any penalty therefor.

It is also said that the assets, two years after the company had been in operation, were not sufficient to pay ninety cents in the dollar upon its liabilities. Admitting such to have been the case, yet it is not shown this was owing to any fault of the trustees; on the contrary, it is to be attributed to the costs of keeping up an institution of this kind in the infancy of its career, and to a depreciation of the bonds of the city of New Orleans, twelve of which were in the possession of the company and estimated in the list of assets at $12,000, although their market value then was about $9,000; besides, as the company had to invest money in these bonds, then as long as it complied with the requisites of its charter in investing its money, and its action was characterized by prudence and skill, forfeiture cannot follow in the event the investments are not profitable.

By the statement of the company published March 4th, 1856, the difference between its assets and liabilities, exclusive of interest due depositors and house rent, was $1,278 11; add to this, $1,542 00, the amount the Directors thought that Garland owed, which, however, he did not, and it will make $2,820, which, with the depreciation of the city bonds, was the total difference between the assets and liabilities of the company on the 4th of March, 1856, less house rent, interest on deposits, and whatever amount might be due Garland, all of which, however, could not have been much, for if they had been, the Attorney General would have established the amount in the lower court. When it is remembered that the company had been in existence but two years, this difference between the assets and liabilities is very little, and independent of the depreciation of the bonds, it was caused by the necessary expenditures for such an institution before sufficient interest could accrue to meet them.

It is also urged, that in order to have resumed business, "the Directors must have made good the deficit in these assets out of their private funds," and that the life of the company ought not to be prolonged in order to give the Directors an opportunity to reimburse themselves by anticipated profits for the

money they may have advanced it. But certainly the State ought not to act as a cruel tyrant, who invites his friends to a feast only to make their deaths more bitter. An institution of this kind, from its very nature, cannot, for three or four years, realize profits sufficient to meet all its liabilities on demand, and there must necessarily be for that time an excess of expenses over profits; if, then, forfeiture must follow for this, where would be the justice or humanity to incorporate an institution which must, from its nature, be unable, if its credit is temporarily destroyed, to meet all its liabilities on demand!

There would be no policy in thus forfeiting the charter either as to the Directors, the public or depositors. It would be a direct injury to the laboring classes, for it would prevent the establishment of similar institutions.

It is also urged, that a judgment of forfeiture "would involve in losses consequent upon the liquidation, all the depositors and others connected with this institution." Yet this is only what would always be the case with every Savings Company, if it was obliged, after being in existence but two years, suddenly to wind up its affairs, for, as it is alleged in the statement of the Trustees, "few establishments of this kind have ever earned their expenses within the first three or four years."

It is also averred, that there was great carelessness in the manner in which the books were kept, because there were mistakes made as to the *Garland* account; but in the lower court there was no attempt to show that the affairs of the company had not been managed with skill, and the Attorney General relied alone in his petition on the notice of the 3d of March. If one mistake proves extraordinary negligence, where is the bank or mercantile house that would escape censure?

It is also objected, that it is not shown, that any inevitable or temporary misfortune occasioned the state of affairs exhibited by the notice of the 3d of March. In answer to this, we would say, that previous to and at the time of this notice, there was much excitement in the public mind. *Mr. Garland* had been President of the institution, great confidence had been reposed in him, and when such serious accusations were made against his reputation, it was natural to suppose that he might have made use of the bonds of the company or its notes, to which he might have had access. This panic caused the Bank of Orleans to withdraw an open credit that this institution had to overdraw, up to $10,000, and depositors withdrew on the 1st of March, 1856, $19,751 44, without notice, and although a part so withdrawn was upon interest. Which of our corporations or mercantile houses would not be in the same state as this institution was on the 3d of March, if their credits with the banks, and their friends in different parts of the world was suddenly stopped?

It is also asserted that it is not established, that the condition of the assets had improved at the time of the trial in the lower court, and that the public avowal of its insolvency has not been rebutted nor withdrawn.

This is answered by reference to the notice of 8th of March, 1856, which announces that the "institution is now fully prepared to resume business and to *meet all its engagements*, whether for its deposits on time or on call."

This is assuredly a rebuttal and withdrawal of the avowal of its insolvency; besides, the petition is based entirely on the notice and not on any subsequent action of the company, and the answer avers that since the notice of March 8th, the company continued to transact business, and to exercise its corporate

privileges, and that by said notice of March 3d and the cessation of business, neither the public nor any individual depositor or creditor of the company suffered any loss, and notwithstanding this averment, the Attorney General did not attempt to contradict it.

Having thus answered some of the arguments in favor of the forfeiture, we shall now proceed to establish that the grounds upon which this forfeiture is demanded, are not sufficient to authorize it.

In order to succeed in this proceeding, the State must establish the violation of a law by the company, which requires the forfeiture on account of the infraction. If no ordinance or statute has been infringed, a tribunal of justice cannot then punish. Courts cannot create laws—their province is to interpret them and ordain their execution; the coalition of the legislative and judicial functions is adverse to our political system, to every republican principle, and to the weal of the people. This corporation cannot then be dissolved, unless it had done that which is forbidden, either by its charter, by some provisions of law, or which is of such a character and so detrimental to public good, that although there is no positive statute, the nature and essence of corporations demand that forfeiture should follow; but such tacit recognition of the necessity of forfeiture must be clear to the common sense of mankind and not the sequence of scholastic logic.

Let us first consider the nature of the charge; it is of a two fold character. The first part of it is, that the company closed its doors, or ceased paying and receiving deposits for seven days, to wit, from the 3d to the 10th March. The second part of the charge is, that it was in a state of insolvency.

The first part of the charge is no cause for forfeiture, for the charter has not ordained how many days in the week the institution must be opened; this is left to the Trustees, and they could, in their by-laws, have enacted their doors should be open but once a week. If then they could have adopted that this as a general rule, then the mere cessation of business for one week, by the notice of March 3d, cannot forfeit the charter.

The closing of the doors for seven days, under the circumstances is not such a *non-user*, or neglect to exercise corporate privileges, for which the charter ought to be forfeited; it is not in this case such an abuse of privileges and refusal to complete the conditions on which such privileges were granted, as is contemplated by Article 438 of the Civil Code.

The second part of the charge is, that the corporation was in a state of insolvency. As this alleged insolvency was not evidenced by any overt act, such as a return of "*nulla bona*," a judgment or even a protest, the true question for our present investigation is, whether a temporary suspension of payment under the circumstances of this case, is a sufficient ground of forfeiture?

The rigid rules of our laws relative to banking operations are not applicable to this case; they relate to offices of discount, deposit and circulation. This institution is not a "bank" in the sense of the statute, and it is clear, that the Legislature did not intend to incorporate a bank; the act authorises a corporation and calls it a corporation and not a bank, and it has no power to issue notes for circulation. It is evident that the statutes, regarding banking corporations, do not govern the case at bar.

When the nature of this institution is considered, temporary suspension of payment appears to be almost necessarily connected with its organization, and if so, it is not then an absolute cause of forfeiture. In order to comprehend its nature, its privileges must be examined. The act of incorporation grants no power besides those common to all corporations, except to receive money, from one dime and upwards, on deposit; to allow interest on it, in accordance with the by-laws of the institution, and to loan the said deposits. No special condition is annexed by the Legislature upon which the privilege is to depend, or for the non-performance of which, the charter is to be revoked.

This company may, in one sense, be considered as necessarily unable to meet, in full, its engagements for a long period after its organization, for it had no funds with which to commence operations—was obliged to hire an office, also officers, and to incur many incidental expenses, before sufficient interest could accrue, from money loaned, to meet its engagements. The business of the company was also of such a character, that temporary suspension of payment must have been contemplated by the Legislature, and by the depositors as incidental to the institution.

The business of this corporation was to receive money on deposit, loan the same, and pay an interest on the deposits. The depositors knew that the corporation had the right, by its charter, to loan its money, and that this was the way for which it was able to pay interest on deposits. These laws might be made with the greatest prudence, yet the company might fail to collect the notes at maturity; violent convulsions in the monetary affairs of the city, might often prevent those who were deemed the most solvent at the time of borrowing the money from meeting their obligations with punctuality; those then, that deposited money with this institution, did it with a full knowledge it was to be loaned; that money lent, is not always punctually paid, and that temporary suspension of payment appertained almost naturally to this corporation. Such temporary suspension of payment must have been contemplated by the Legislature and depositors, as incidental to the corporation, and cannot then be a sufficient cause for forfeiture.

The principles decided in this case, must not be considered as applying to an institution like this, which should fraudulently suspend payment, for such conduct might be placed under the provisions of Article 438, of the Civil Code, and considered an abuse of the privileges of the corporation and a refusal to complete the conditions on which said privileges were granted; gross negligence in loaning money without sufficient guarantee, by which temporary suspension of payment might ensue, might perhaps also subject the charter to forfeiture. In this case, the Directors appear to have been actuated by laudable motives in giving the notice of 3d of March, and ceasing their operations. Their conduct does not appear to be polluted with fraud, nor to have been followed by injury to the depositors, for so far as the record shows, no creditor has ever · instituted proceedings against the corporation. It ought also to be remarked, that we decide this case on principles peculiar to the nature of the charter of this company.

Considering then, the circumstances of this case, and the nature of the charter, it is evident that the closing of the doors, the cessation of business, and the temporary suspension of payment of this company for a few days, are not sufficient cause for forfeiture. Vide *People* v. *Bank of Hudson*, 6 Cowen,

217; *People* v. *Washington and Warren Bank*, 6 Cowen, 216; *State* v. *Gas Light and Banking Company*, 2 Rob. 529; Angel & Ames on Corporations, 745; Revised Statutes, 116, 1, 12.

It is, therefore, ordered, adjudged and decreed, that the judgment of the court below, be avoided and reversed, and proceeding to render such judgment as ought to have been rendered by said court, it is, ordered, adjudged and decreed, that the demand of plaintiff be rejected, with costs in both courts.

SPOFFORD, J., dissenting. I take it to be well settled that the misuse and abuse of corporate functions in Louisiana, as at the common law, are sufficient grounds upon which to declare the forfeiture of an act of incorporation. Indeed such is the express provision of Art. 438 of the Civil Code.

It is also settled, that it is a tacit condition of every act of incorporation, and that the violation of the tacit condition is a ground of forfeiture. The *State* v. *the New Orleans Gas Light and Banking Company*, 2 R. 522; Angel & Ame's on Corp. 510.

Whether a corporation, in a particular place, has violated this tacit condition upon which it was created, is a judicial inquiry, the solution of which depends first upon the object or end of the corporation, and secondly upon the mode in which the corporators have carried out their end, in other words, upon the proven facts of the case.

The object of a savings institution is not to enrich the corporators, or to provide them funds to speculate upon, but to benefit the poorer classes of society.

The preamble of the act in this case, intimates its design, " Experience having proven that savings institutions have been productive of great benefit to the laboring classes, by inducing habits of economy and industry, therefore be it enacted, &c.

The charter and the by-laws, in this case, show that inducements were held out to people of small means, to deposit their savings in sums from one dime upwards, with the corporation, upon the assurance that funds so deposited should be secured in the most ample manner; should be returnable on call or at a fixed period, as agreed upon at the time of the deposit, and pay an interest of three per cent. on sums deposited for a time longer than sixty days, five per cent. for a time between three and six months, and five per cent. for a longer period than six months.

It was therefore implied among the conditions of the continuance of the franchises of this company, that they should conduct their affairs with economy, prudence and skill, sufficient to ensure the safety of the entire capital deposited with them as a sacred trust, and to pay continually, and at the times stipulated in their contracts with depositors, the principle and the conventional interest. Any course of management which, after a fair and reasonable trial, should show that all this was not secured to the beneficiaries of the corporation, would justify a revocation of the grant for misuse, or for a violation of its implied conditions.

And now for the facts. After being about two years in operation under this charter, the directors of the Louisiana Savings Company published, in the gazettes of New Orleans, the following notice:

"The Commissioners of the Louisiana Savings Company are constrained to say that, after due consideration, they deem it their duty to place in liquidation, the affairs of the institution. We pledge ourselves that the assets shall be faithfully appropriated.

"The liabilities of the company do not exceed $50,000. The assets will realize about $45,000, although they are nominally more.

          (Signed)    R. L. ROBERTSON, President., *pro tem.*

                    J. N. PHILLIPS, Treasurer.

New Orleans, March 3d, 1856."

On the 5th of March, a carefully prepared statement was published, which was intended to assure the public that the insolvency was not so great as admitted by the previous notice. But in this statement, it is now proven by the company, that there was a remarkable error. Among their assets they classed a claim on *Wm. H. Garland,* for over-draft, $1,542, which the treasurer testifies was a mistake, and that so far from being a creditor of *Garland,* the company owed him at that time, in cash, an amount of which is not stated.

The twelve bonds of the city of New Orleans, would seem to have been put in the list of assets at $12,000, when it is well known that they never were at par, and the record shows that they had once been pledged to the Bank of New Orleans for a credit of only $10,000. Counting these bonds at their market value, which certainly did not depreciate in the hands of the company, and deducting the erroneous claim against *Garland,* it appears that the assets of the company were, at the most favorable estimate, five thousand dollars less than their liabilities to depositors, exclusive of interest, house rent and the balance due *Garland.* The statement made by the directors on the 3d of March, that the institution was insolvent, is thus proved to have been true, after the more mature examination published on the 5th. This insolvency was not denied in the answer, and it is not pretended that, at any time since, the assets have become equal to the liabilities. Indeed the appellant's counsel, in his printed argument, has stated that "The directors must have made good the deposit, in their assets, out of their private funds," in other words, the corporation borrowed from Peter to pay Paul. This of course, could not change the real pecuniary condition of the company. But the step was taken, after a deliberation of several days, when the directors changed their minds, and concluded that they would rescind their resolution to go into liquidation, and endeavor to resume the corporate franchises which they had for a time abandoned.

They therefore gave notice that the institution would "resume business, and meet all its engagements, whether for its deposits on time or on call." Accordingly it is stated, that up to the time of trial in the court below, it had continued to receive deposits and pay claims on demand.

This was relied on, as the sole reason why the charter should not be forfeited.

It may be conceded, that if the resolution to go into liquidation on account of the acknowledged inadequacy of the assets to meet the liabilities of the company, was based upon a mistake as to that vital fact, the suspension for a week would not work a forfeiture. But if there was no mistake as to that fact, I apprehend that the company could not be permitted to play fast and loose, to suspend and go into liquidation one week, and then to resume upon a borrowed capital, with the hope of working out of embarassment and real insolvency by fortunate investments or speculations.

And that is precisely what I understand the company contends it had a right to do. For it is not pretended that the assets of this company have ever equalled its liabilities. It has had a trial of about three years, surely a trial

sufficiently long to test its capacity; no showing of any better condition than an ability to pay ninety cents on the dollar, (upon a full statement) has been made by the company. Indeed it is argued, in the printed argument, filed on its behalf, as a reason why indulgence should be extended to it, that a judgment of forfeiture now, "would involve in losses consequent upon the liquidation all the depositors and others connected with this institution."

And it is not shown that any temporary or inevitable misfortune produced this disastrous result. No depreciation of property is pretended to have occurred. The suspension is now attributed to the panic created by the flight of its President, *Garland*, for alleged defalcations. But, at the time, it was attributed to the inadequacy of the assets to meet the liabilities, an inadequacy which it amply proved in this record. There was no mistake as to that fact, and the only mistake the directors made at the time, was that they had a claim on *Garland*, when *Garland* had a claim on them; that is, they supposed the institution to be better off than it turned out to be. The repeated mistakes as to this account, shows that the business was, to say the least, negligently conducted.

After a fair and reasonable trial, I do not think this corporation has shown that it is in a sound and healthy condition, so as to meet the public wants out of its own resources. The commendable liberality of some of the directors, (who are not individually liable to the depositors,) in loaning to the company the means to resume payment for the time being, does not require that its life should be prolonged, in order to give them an opportunity to reimburse themselves by anticipated profits. An institution whose assets, after two years' operation, can only pay ninety cents in the dollar to its intended beneficiaries, but real benefactors, is not such a "savings institution" as was contemplated by the Legislature. It fails to satisfy the object of its creation, and, in my judgment, should be dissolved.

I therefore, think the judgment of the Third District Court should be affirmed.

Mr. Justice Voorhies, concurred in the above dissenting opinion of Mr. Justice Spofford.